## Branson, Administratrix, v. Kitchenman, Appellant.

*Statute of frauds—Promise to pay the debt of another.*

Where the plaintiff's testimony was to the effect that defendant, who held a senior judgment against the property of a debtor of both, promised that after buying in the property at a sheriff's sale which was about to take place, he would pay off plaintiff's judgment, which was a junior incumbrance, the alleged promise was clearly an undertaking to pay the

---

* See Bennett's Estate, *ante*, p. 139.

debt of another without consideration, and the jury should have been instructed that the alleged agreement was void under the statute of frauds.

*Evidence—Irrelevant testimony.*

Upon a trial of the issue, whether defendant promised that after purchasing property at sheriff's sale he would pay to plaintiff the debt due him by the defendant in the execution, evidence of the value of the machinery purchased by the defendant is irrelevant to the issue and should be excluded.

*Charge of the court—Assuming facts in dispute.*

The question at issue being whether defendant had promised to pay a debt to plaintiff, which was denied by defendant, the court in charging the jury said: "In this situation of affairs there was an agreement of some kind made between the plaintiff and defendant, and a serious question which you are called upon to determine in this case is as to what was that agreement:"

*Held* to be error: The instruction was misleading, since the question was whether any such agreement existed and the fact of its existence was for the jury, but was assumed by the court in the above instruction.

Argued March 30, 1892. Appeal, No. 167, Jan. T., 1892, by defendant, James Kitchenman, from judgment of C. P. No. 2, Philadelphia Co., June T., 1888, No. 128, on verdict for plaintiff, Isabella Branson, administratrix of George Branson, deceased. Before PAXSON, C. J., GREEN, WILLIAMS, MITCHELL and HEYDRICK, JJ.

Assumpsit for breach of contract.

The facts of the case appear by the opinion of the Supreme Court and by the charge of the court below, PENNYPACKER, J., which was as follows:

" This is a case in which I am sure you will give careful attention to the testimony, and it is one which you will find of considerable difficulty. It appears that in June, 1884, the firm of Vernon & Co. were in financial straits. They owed to the defendant here the sum of $3,500 for borrowed money, for which a judgment note, dated in April, had been given, and a further sum of some $650 for merchandise ; they owed the plaintiff here $2,500 for borrowed money, and they owed to Mr. Blood about $2,000 for borrowed money, and to other creditors some $30,000. [In this situation of affairs there was an agreement of some kind made between the plaintiff and the defendant, and the serious question which you are called upon to determine in this case is as to what was that agreement.] [2]

" The difficulties are considerably increased by the fact that
not only the parties themselves differ in their testimony as to
what that agreement was, but the witnesses differ in their tes-
timony now from the testimony which was given on other oc-
casions, and even in the course of the evidence which they give
now upon the stand there arises a material difference. Amid
all these difficulties you are, however, to ascertain what was
the character of the agreement made.

" The contention of the plaintiff is that it was an agreement
on the part of the defendant that the goods should be sold at
sheriff's sale and that he would be the purchaser; that the
goods were to be bid up to an amount to cover the judgments
that were given to the plaintiff and to Mr. Blood, and that out
of the proceeds of the sale the defendant was to pay the plain-
tiff the amount of his judgment.

" Mr. John Blood, who was a witness produced for the plain-
tiff, in giving his account of the agreement, says that ' The
defendant told me and Branson, the plaintiff, that out of the
proceeds of the sale our notes would be paid.' ' Make out these
notes and I will pay them out of the proceeds of the sale.' He
is corroborated in that testimony by George Blood, who says
that Mr. Kitchenman said ' the judgment notes were borrowed
money to be paid. He would buy the place in, the judgments
should be paid, and he would arrange to put the place in his
name; and again, that he would have the sale fixed up so as to
fetch money enough to pay them the judgments that were to
be paid out of the proceeds of the sale.'

" To some extent that testimony is corroborated by certain
other witnesses. Mr. Vernon, who, you remember, was one of
the firm, says, ' They were to give to all of them judgments.
They were to be secured, all the borrowed money was to be se-
cured. Mr. Kitchenman was to sell out the place to make it
fetch as much as would cover the judgment notes for the bor-
rowed money.' Mr. Johnson, who was the bookkeeper of the
firm, also gives some testimony, which, in some of its features,
corroborates the statements made by these witnesses. He says
that ' Mr. Kitchenman told him to put a price on each lot, so
that it will cover my judgment, Mr. Branson's and Mr. Blood's,
and the costs; I want to fix it up so that it will pay the judg-
ment notes; the others must wait.' While there has been a

good deal of testimony in this case, those are the main features of the testimony of the witnesses for the plaintiff.

" You will consider all the testimony, and consider all the facts of the case, and say whether or not that was the arrangement which was made.   You will see from the testimony whatever the arrangement was, the defendant, Mr. Kitchenman, was put in a different position from the plaintiff.   It does appear that the plaintiff gave up a lien under the execution upon the judgment upon the property which was testified to have been worth some $24,000, subject, of course, to the prior liens, and that he gave a receipt for his proportion of the proceeds of the sale, and after that had no hold upon the property which was transferred.   Mr. Kitchenman, upon the other hand, got the goods ostensibly into his own possession by the sale under the judgment.   He was the purchaser at that sale, and the business was afterwards, under some arrangement, conducted in his name and the proceeds were to be turned over to him, so that he was in a different position so far as protecting his own interests was concerned, certainly from that occupied by the plaintiff.   If the arrangement was, and you will consider this fact in endeavoring to ascertain what this arrangement was, that the defendant was to bid up the goods to an amount to cover the judgment, that arrangement was not carried out to that extent, because it appears that the property was bid up only to the sum of $7,830, and the amount of these judgments would amount to over $9,000 irrespective of any lien of the mortgage.   It is also argued, and with a good deal of force, on the part of the defendant, that if the arrangement was that the plaintiff was to be paid out of the proceeds of the sale, it is difficult to understand why he did not urge his right to those proceeds at the time.   If that was the understanding that he was to get it then and get it out of those moneys, he seems to have done just the other thing, because he gave a receipt ostensibly to show that the moneys were paid when really he did not get them at all. [If that was the contract between the parties, and the defendant was to buy the goods in and afterwards conduct the business, and the plaintiff was to be paid out of the proceeds of the sale, and it was the whole contract, then your verdict ought to be for the plaintiff.] [3]

" [It is a contract which can be enforced, if there be nothing

more in it than what I have explained to you from the testimony of the plaintiff's witnesses. It was apparently for a good consideration, since the plaintiff gave up his right to the lien and gave up whatever claim he might have upon the proceeds of the sale, and the defendant was to get the goods without paying the amount for which he had bid.] [4]

" On the part of the defendant, however, it is denied that the contract was so made. Mr. Kitchenman says: ' I did not say that I would pay the judgment out of the proceeds of the sale. The judgments were to be paid out of the proceeds of the business. There was no agreement as to bidding it up to any amount,' and then says that ' under the arrangement which was made, Vernon & Co. were still to carry on the business; that they controlled everything and that it was their business.' Mr. Letchworth, and I think it proper to say to you that a great deal of importance ought to be attached to the testimony of Mr. Letchworth, who was the counsel of the parties at the time, and who seems to have put down in writing his view of what occurred, or at least much of it, says ' it was the understanding that it was to be bid in for the benefit of Vernon & Co. and in Mr. Kitchenman's name. Mr. Vernon was to go on until they got over their trouble; it was to keep Vernon & Co. in business, and that he never heard of Mr. Kitchenman undertaking to pay the amount of the other judgments.'

" As Mr. Kitchenman testifies to the contract, it was nothing more apparently than an agreement to postpone, on the part of Mr. Kitchenman and the plaintiff, their right to recover from Vernon & Co. They gave up their judgments with a view to the benefit of Vernon & Co., and Vernon & Co. were to continue the business, and after certain of the debts were paid, or all of them, Mr. Kitchenman's name was to be withdrawn and it was to be handed over to them. It amounted substantially to a postponement of the rights of the parties, looking still to the liability upon the part of Vernon & Co., with the further arrangement that it was to be ostensibly in the name of Mr. Kitchenman, to be conducted in his name. He was to lend them credit. While the purpose of this arrangement does not appear with entire clearness, there has been testimony that the object of it was to save them from the demands and claims of the remaining creditors; that it was in-

tended to protect the judgment creditors and, at the same time, permit Vernon & Co. to go ahead with their business, while apparently it was in the name of Mr. Kitchenman. Now if this was the arrangement and the understanding, then it was a contract upon which the law frowns, since it was substantially an attempt under cover of Mr. Kitchenman's name to hold the creditors at bay while in reality Vernon & Co. were the owners of the property. If the plaintiff entered into that arrangement, and that was the arrangement, he would not be entitled to recover, because the consideration would be illegal. He would have no rights under such a contract, at least not such rights as could be enforced.

" Mr. Kitchenman, while on the stand, testified in the way in which I have described. [In his affidavit of defence, however, and that affidavit has been offered in evidence, he says that the agreement was entirely, I may say, of a different character.] [5] He said there : ' It was expressly agreed that the defendant should be liable to pay the plaintiff's judgments and the judgment of the other judgment creditor only out of the profits of the business, if any, and then only after the defendant's judgments had been fully paid.' In other words, he set up there that the contract was that he was to go ahead and conduct the business, and that he was to pay the plaintiff, but only out of the profits and after his own judgment had been paid. If that was the agreement between the parties, as it appears in the affidavit which he made, it would be incumbent upon the plaintiff before he could recover to show that there were profits from which that amount could be realized. [He has given some evidence here, or at least Mr. Kitchenman, on his cross-examination, said that a statement made out by the bookkeeper of the first year's business showed a profit of some $12,000. If there was such a profit, and it was enough to cover the judgments of Mr. Kitchenman and to pay something besides, and that was the agreement, then the plaintiff would be entitled to recover what sum there was remaining to the extent of the claim.] [6] Mr. Francis, an expert accountant, who went over the books, testified, however, that there was no evidence on the books that any amount had been made. He said there had been some profits, but it could not be ascertained from the books as to how much it was or what it was.

" I have now gone over the facts of the case with you, and [I say to you, as I have said to you before, if the contract was as testified to by the plaintiff, and that the defendant was to take the goods and was to pay, out of the proceeds of the sale, the claim of the plaintiff, and there was nothing more in the agreement than that, the plaintiff ought to recover.] [If it was substantially a scheme to prevent the other creditors from recovering what was due to them, Mr. Kitchenman's name was simply to be used and the property was still to be that of the firm of Vernon & Co., that is a fraudulent transaction in law, whatever the parties may have intended by it, and the plaintiff would not be entitled to recover.] [7]

" If the agreement was as testified to by Mr. Kitchenman, and to some extent, at least, corroborated by Mr. Letchworth, and amounted to an extension of time with the liability on the part of Vernon & Co. still remaining for this indebtedness, without an undertaking on the part of Mr. Kitchenman to pay the indebtedness, then the plaintiff is not entitled to recover."

The defendant submitted, inter alia, the following points :

" 6. It being uncontradicted that the proceeds of said sale amounted to $7,830, of which $4,820 were the proceeds of the boiler, engine, shafting, and machinery, and $3,010 were the proceeds of other personalty, the jury is instructed that the defendant was entitled to the entire $4,820 under and by virtue of his mortgage dated March 18, 1879, and to the remaining pro-ceeds under and by virtue of his judgment obtained June 18, 1884, and that these with the costs and accrued interest con-sumed the entire proceeds of said sale. *Answer :* I decline that point. Whatever were the priorities of the lien and amounts of it, if the defendant, as has been testified to by the plaintiff, promised the plaintiff that he would pay this judg-ment out of the proceeds of the sale, he would be bound to pay them from those proceeds, even though they did not reach more than enough to cover the prior lien. [8]

" 9. The alleged agreement between the plaintiff and defend-ant, upon which the plaintiff now seeks recovery, is void as against public policy, and your verdict must be for the defend-ant. *Answer :* I decline that point. I have told you as to what the law is upon that subject, and this point does not set out what the alleged agreement was, as testified to by the plain-

tiff; it does not come within the law which the defendant here wishes to invoke. [9]

" 11. If the plaintiff and defendant surrendered any possible share of the proceeds of the sheriff's sale, to which they claim they were entitled, to Vernon, Blood & Co., and allowed them to continue the business and pay out of future profits the judgments of plaintiff and defendant, then the plaintiff and defendant were partners and assumpsit will not lie to state an account between them. *Answer:* I decline that point. [10]

" 12. If the jury believe that the business subsequently to the said sale, conducted in the name of James Kitchenman, resulted in a loss, and was never profitable, then the plaintiff cannot recover. *Answer:* I decline that point. [11]

" 14. Under all the evidence the verdict must be for the defendant. *Answer:* I decline that point." [12]

Verdict for plaintiff for $1,936.79 and judgment thereon. Defendant appealed.

*Errors assigned* were (1) the admission of the evidence as to the aggregate value of the machinery in the mill referred to in the opinion of the Supreme Court; (2–7) the portions of the charge in brackets, quoting them; (8–12) answers to defendant's points, quoting the points and the answers.

*James M. Beck, F. Pierce Buckley* with him, for appellant.

*C. W. McKeehan, William M. Mervine* with him, for appellee.

OPINION BY MR. CHIEF JUSTICE PAXSON, April 18, 1892:

In the year 1884, the firm of Vernon, Blood & Co., manufacturers of hosiery, became embarrassed. At that time they were indebted to James Kitchenman, the defendant, in sum of $3,500 for borrowed money. The latter also held a purchase-money mortgage for $16,200, which covered the factory, land and machinery. They were also indebted for borrowed money to George Branson, whose estate is the plaintiff in this suit, and also to John Blood. John Blood was the brother, and George Branson was the cousin of George Blood, of the firm of Vernon, Blood & Co. The defendant does not appear to have been related to any of the parties. Vernon, Blood & Co. informed the defendant of their embarrassed condition, whereupon a consultation was had between them and Branson and Blood, the other two creditors named. It was understood and

agreed by all, that it was the duty of the firm to protect the creditors from whom they had borrowed money. It was also desired by each of the creditors that some arrangement should be made by which the firm could continue in business, and, if possible, pay all their debts. With this object in view a meeting was subsequently held between these parties at the office of Albert S. Letchworth, Esq., a reputable member of the Philadelphia bar. It was there agreed, that Letchworth, acting as attorney for all the parties, should issue executions on the claims of said creditors, and sell the property of the defendant at sheriff's sale. The property was so sold and purchased by Kitchenman, the defendant, in pursuance of this arrangement. It was understood that he was to hold the title to the property for the benefit of the firm, the business in the meantime to be conducted in his name, and at his risk. It was further understood that the property was to be turned over to the firm whenever it should be able to pay its debts. In pursuance of this arrangement the three execution creditors, before named, receipted to the sheriff on their executions for the proceeds of the sale. No money was paid to the sheriff beyond the costs.

So far I understand the facts to be undisputed. The point of divergence comes in just here. It was contended by the plaintiff that the defendant had promised to pay the judgments held by George Branson and John Blood out of the proceeds of the sheriff's sale. The defendant contended that these judgments were to be paid only in case the subsequent profits of the firm were sufficient to pay them. In point of fact there appears to have been no profits. The business was carried on for several years by Vernon, Blood & Co., in the name of the defendant, and resulted in a loss of from eight to ten thousand dollars. He alleged that the business had been badly managed by William Vernon and George Blood; that they had raised their own salaries and the salaries of the other employees without his knowledge or consent, and as a result he was compelled to discharge them. Suits were then commenced by George Branson and John Blood against the defendant, to recover the amount of their respective judgments, upon the allegation, as before stated, that he had agreed to pay them out of the proceeds of the sheriff's sale. It does not appear that the plaintiff

ever made any demand upon the defendant otherwise than by the commencement of this suit.

With this brief explanation of the facts of the case we will consider some of the specifications of error. The first alleges that the court erred in admitting certain evidence in regard to the value of the machinery. The admission of this evidence was clear error. It was not relevant to the issue. It had nothing to do with the question whether there was a contract between the parties in regard to the payment of plaintiff's claim, or of the nature of that contract.

The second specification alleges that the learned judge erred in charging the jury as follows: " In this situation of affairs there was an agreement of some kind made between the plaintiff and defendant, and a serious question which you are called upon to determine in this case is, as to what was that agreement." We regard this instruction as misleading. The jury could not fail to have understood that the learned judge referred to an agreement between the plaintiff and defendant in regard to the payment of this claim. It is not pretended that there was any written agreement. If it existed at all, it was oral, and was proved by oral testimony. It was therefore for the jury to find whether there was an agreement, and, if so, what it was. The defendant utterly denied that he was to pay this claim, or that he had promised to pay it under any circumstances. It was only to be paid out of the business in case the business justified it. This was the vital point in the case, and the learned judge assumed a fact which could only be found by the jury.

The defendant further contended that, even conceding the plaintiff's statement to be true, it was a mere oral promise to pay the debt of another, and that it came within the statute of frauds. In this we think he was right. The mere promise to pay, made prior to the sheriff's sale, was nudum pactum. It had no consideration to support it. This clearly appears from the testimony of John Blood, the plaintiff in the other suit, and the witness principally relied upon in this suit. This is so important that, at the risk of being tedious, I quote a few lines from his testimony: " Q. Do you mean to say that Mr. Kitchenman, who held the senior judgment, guaranteed the payment of your later judgment? A. He said he would.

Q. What reason did he give for offering to pay something you were not able to get otherwise? A. He did not give any reason. Q. Did he ask you to do anything for him in consideration of that? A. No, sir; he did not ask me to do anything. Q. Did he ask you to abstain from doing anything? A. No, sir. Q. Did you give any consideration for his promise to pay your judgment? A. No, sir; nothing whatever. Q. I understand that, without any consideration from Mr. Kitchenman, without any promise on his part to do, or not to do anything, or any promise on your part to do, or not to do anything, he voluntarily said, out of the proceeds of a certain sale, to take place in the future, he would pay your notes? A. Exactly; that is correct."

I do not recollect that any other witness testified to a contract between the plaintiff and the defendant. There was considerable loose testimony as to conversations between the defendant and others when the plaintiff was not present. The plaintiff, being deceased, of course, could not be examined, and the witness, Blood, being the plaintiff in the other suit, was vitally interested in establishing a binding contract between the parties. His statement of the alleged agreement was flatly contradicted by Mr. Letchworth, a wholly disinterested witness, who acted as counsel for all three of the creditors. It was also contradicted by the defendant. Moreover, the whole story has about it an air of extreme improbability. That Mr. Kitchenman, having no interest in the firm, should make considerable sacrifices to keep it afloat, is a matter we can understand, although such liberality is somewhat rare. That he should, in addition to this, also agree to pay the debts which the firm owed to their own relatives for borrowed money, is a proposition which requires strong testimony to support it. It is difficult to see how the jury could have rendered the verdict they did, unless misled by something that occurred upon the trial.

The mere naked promise of the defendant, made before the sale, that he would pay the plaintiff out of the proceeds thereof, was, as before stated, without consideration. The plaintiff gave nothing, and promised nothing, for such agreement. There was nothing to prevent his bidding at the sheriff's sale, and thus securing himself, if he saw proper to do so. There is nothing in the case but a bare promise to pay the debt of another. There

was not, in any sense, an original undertaking on the part of the defendant. The defendant's fourteenth point, which prayed for a binding instruction in favor of the defendant, should have been affirmed without qualification.

Judgment reversed.